CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
JAYA GUPTA (Bar No. 312138)
(E Mail:  jaya_gupta@fd.org)
Deputy Federal Public Defender
411 West Fourth Street, Suite 7110
Santa Ana, California 92701-4598
Telephone: (714) 338-4500
Facsimile: (714) 338-4520

Attorneys for Defendant
DANNY DOUGLAS HUDSON

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>        v.<br><br>DANNY DOUGLAS HUDSON,<br><br>            Defendant. | Case No. 2:22-cr-00565-DOC<br><br>**DANNY HUDSON'S SENTENCING POSITION PAPER**<br><br>Hearing Date: July 24, 2023<br>Hearing Time: 1:30 p.m. |

Defendant Danny Douglas Hudson, by and through his counsel of record, Deputy Federal Public Defender Jaya Gupta, hereby files his sentencing position paper for the Court's consideration before the July 24, 2023, sentencing hearing. For the reasons provided in his Memorandum of Points and Authorities, Mr. Hudson respectfully requests that this Court impose a sentence of 18 months imprisonment to be followed by a five year term of supervised release.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  July 17, 2023

By: */S/ Jaya Gupta           .*
JAYA GUPTA
Deputy Federal Public Defender

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **Table of Contents**

I. INTRODUCTION ..................................................................................................1

II. OBJECTIONS TO THE PRESENTENCE REPORT ....................................1

    A.    Factual Objections to the Presentence Report .....................................1

    B.    Legal Objections to the Presentence Report ......................................2

          1.    Mr. Hudson's Base Offense Level Is 12 Because He Is a Tier I Offender ....................................................................................2

    C.    Objections to Guidelines Calculation of Supervised Release Term and Certain Proposed Conditions of Supervised Release ................................12

          1.    The Guidelines Recommend Five Years, Not a Lifetime Period of Supervised Release ....................................................12

          2.    Proposed Condition #11 Is Unconstitutional, Especially When Imposed For Life ..................................................................13

          3.    Proposed Condition #15 Is An End-Run Around SORNA and Not Reasonably Necessary Once the SORNA Term Has Expired..14

III. SECTION 3553(A) FACTORS SUPPORT A SENTENCE OF 18 MONTHS FOLLOWED BY FIVE YEARS OF SUPERVISED RELEASE ......................16

    A.    Mr. Hudson's History and Characteristics.................................16

    B.    Nature and Circumstances of the Offense Conduct...................18

    C.    Need for Deterrence and to Promote Respect for the Law ....................19

    D.    Need to Avoid Unwarranted Sentencing Disparities ................20

IV. CONCLUSION ..............................................................................................22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*United States v. Agritelly*,
   665 F. App'x 109 (2d Cir. 2016) ........................................................................ 12

*United States v. Agritelly*,
   No. 14-cr-00090, ECF No. 70 (D. Conn. Aug. 31, 2017) ........................... 13, 21

*United States v. Berry*,
   814 F.3d 192 (4th Cir. 2016) ......................................................................... 3, 21

*United States v. Booker*,
   543 U.S. 220 (2005) ........................................................................................... 16

*United States v. Cabrera-Gutierrez*,
   756 F.3d 1125 (9th Cir. 2014) ............................................................................. 3

*Carr v. United States*,
   560 U.S. 438 (2010) ..................................................................................... 15, 18

*United States v. Davis*,
   139 S. Ct. 2319 (2019) ............................................................................... 8, 9, 11

*Descamps v. United States*,
   570 U.S. 254 (2013) ............................................................................................. 3

*Gall v. United States*,
   552 U.S. 38 (2007) ............................................................................................. 16

*United States v. Garcia*,
   604 F.3d 575 (8th Cir. 2010) ............................................................................. 21

*United States v. Gomez-Hernandez*,
   680 F.3d 1171 (9th Cir. 2012) ............................................................................. 4

*United States v. Hart*,
   No. 12-cr-00004, ECF No. 36 (D. Guam Nov. 13, 2013) .................................. 21

ii

*United States v. Kelly*,
  630 F. App'x 416 (6th Cir. 2015)................................................................13

*Kimbrough v. United States*,
  552 U.S. 85 (2007).............................................................................16

*United States v. Martinez–Lopez*,
  864 F.3d 1034 (9th Cir. 2017) ...............................................................3

*United States v. Millis*,
  621 F.3d 914 (9th Cir. 2010) ................................................................11

*United States v. Navarro*,
  54 F.4th 268 (5th Cir. 2022) .................................................................3

*Nijahawan v. Holder*,
  557 U.S. 29 (2009).............................................................................9

*United States v. Payne*,
  No. 19-cr-00041, ECF No. 41 (E.D. Okla. Oct. 5, 2020)..................................21

*Rebilas v. Mukasey*,
  527 F.3d 783 (9th Cir. 2008) ...............................................................4

*United States v. Urango*,
  No. 18-cr-00071, ECF No. 32 (E.D. Okla. Oct. 24, 2019)................................21

*United States v. Walker*,
  931 F.3d 576 (7th Cir. 2019) (Barrett, J.).......................................3, 7, 9

*United States v. White*,
  782 F.3d 1118 (10th Cir. 2015) ..............................................................7

*United States v. Whitehead*,
  532 F.3d 991 (9th Cir. 2008) ................................................................16

*United States v. Williams*,
  659 F.3d 1223 (9th Cir. 2011) ...............................................................8

**State Cases**

*State v. Less*,
  170 W.Va. 259 (1981) ........................................................................4

*State v. Minigh*,
224 W. Va. 112 (2009) .................................................................................4, 11

*Outmezguine v. State*,
335 Md. 20 (1994) .............................................................................................6

**Federal Statutes**

8 U.S.C. § 1101(a)(43) ..........................................................................................4

18 U.S.C. § 924(c)(3) ........................................................................................8, 9

18 U.S.C. § 2244 ........................................................................................*passim*

18 U.S.C. § 2246(3) ......................................................................................5, 6, 7

18 U.S.C. § 2250 ........................................................................................*passim*

18 U.S.C. § 2252 ...............................................................................................10

18 U.S.C. § 2252A .............................................................................................10

18 U.S.C. §2260 ................................................................................................10

18 U.S.C. § 3583(d) ...............................................................................13, 14, 15

18 U.S.C. § 3583(k) ...........................................................................................12

34 U.S.C. § 20911(3) ..................................................................................*passim*

34 U.S.C. § 20915 .............................................................................................15

18 U.S.C. § 3553(a) ...........................................................................................16

**State Statutes**

ARS §§ 13–1001 .................................................................................................4

ARS § 13–1403(B) ..............................................................................................4

720 ILCS 5/11-20.1 ..........................................................................................10

Cal. Penal Code § 311.1 ....................................................................................10

Cal. Penal Code § 311.4 ....................................................................................10

Cal. Penal Code § 647(b)(3) ...................................................................10

D.C. Code Ann. § 22-3102 ....................................................................10

Fla. Stat. Ann. § 827.071 ........................................................................10

Fla. Stat. Ann. § 847.0371 ......................................................................10

Haw. Rev. Stat. Ann. § 707-751 .............................................................10

Haw. Rev. Stat. Ann. § 712-1209.1 (2016) ............................................10

Ky. Rev. Stat. Ann. § 531.310 ................................................................10

La. Stat. Ann. § 14:83 .............................................................................10

Minn. Stat. Ann. § 609.324 .....................................................................10

Minn. Stat. Ann. § 617.246 .....................................................................10

N.C. Gen. Stat. Ann. § 14-205.1 ............................................................10

N.Y. Penal Law § 263.05 ........................................................................10

S.C. Code Ann. § 16-15-342 ...................................................................10

Tenn. Code Ann. § 39-13-528 .................................................................10

Tex. Penal Code § 43.03 .........................................................................10

W. Va. Code § 61-8C-1 .............................................................................6

W. Va. Code § 61-8C-2 .....................................................................*passim*

W. Va. Code § 61-10-31 ....................................................................*passim*

**Other Authorities**

U.S.S.G. § 2A3.5 .......................................................................................2

U.S.S.G. § 5D1.2(b)(2) ...........................................................................12

U.S.S.G. § 5D1.2(c) ................................................................................12

U.S.S.G. § 5D1.3(7)(C) .....................................................................13, 14

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

The first thing one notices about Danny Douglas Hudson—apart from his piercing blue eyes and his heavy, West Virginia drawl—is his weathered face. Far younger (indeed, barely 54 years old) than that weathered face reveals, Mr. Hudson has experienced more adversity than most people do in a lifetime. The lines on his face, the grayness in his hair, and the metal plates replacing his bones (PSR at ¶ 103), are all relics of a life marred by abuse, addiction, homelessness, poor decisions, and untreated mental illness. Seeking a better life in sunny, Southern California with his beloved wife and co-defendant, Sadie, Mr. Hudson traveled to this State and failed to update his sex offender registration. His failure was not for any nefarious purpose—to the contrary, he had registered *numerous times before*, including the year prior. Registering, however, just was not a priority when he was living on the streets, suffering from untreated schizophrenia, and drowning in alcohol addiction. Mr. Hudson recognizes that he did wrong by violating 18 U.S.C. § 2250 and deeply regrets his conduct, as demonstrated when he pleaded guilty not even two months after being arrested. 18 months of incarceration followed by five years of supervised release is sufficient to punish him for his dereliction and to accomplish the remaining goals of sentencing in this case.

### II. OBJECTIONS TO THE PRESENTENCE REPORT

**A.    Factual Objections to the Presentence Report**

**Page 4-5, Paragraph 8**: The PSR states that on October 3, 2013, Hudson was sentenced to one to five years to the state penitentiary for violating WV Code § 61-10-31. The Sentencing Order dated October 3, 2013, makes clear that Mr. Hudson's sentence was suspended and that he was instead sentenced to five years of probation.[1] *See* Ex. A.

---

[1] As the PSR later mentions, Mr. Hudson's suspended sentence was re-imposed following a probation violation. *See* PSR at ¶ 53.

Additionally, while the PSR references the Plea Hearing Order finding the offense to have been sexually motivated, Mr. Hudson respectfully asks that this paragraph also include the fact that the Sentencing Order found Mr. Hudson to be "at a low to moderate risk to reoffend[,]" pursuant to a Sex Offender Presentencing Evaluation prepared by Dr. William Fremouw, Ph.D., a licensed psychologist. *See id*.

**Page 15, Paragraph 54:** Similar to above, the PSR states that on October 3, 2013, Mr. Hudson was sentenced to "1-5 years penitentiary, 5 years' probation." This sentence should reflect that the sentence of 1-5 years penitentiary was suspended. *See* Ex. A.

## B.    Legal Objections to the Presentence Report

Mr. Hudson respectfully disagrees with the PSR's calculation of his Sentencing Guidelines range. Specifically, while he agrees with the calculation of his criminal history points and category, he disagrees with the calculation of his offense level for the reasons set forth below:

### 1.    Mr. Hudson's Base Offense Level Is 12 Because He Is a Tier I Offender

Mr. Hudson objects to the offense level calculation in the PSR (PSR at ¶¶ 25-37) because his offense of conviction is neither (1) a categorical match to "abusive sexual contact (as described in section 2244 of title 18)" nor did it (2) "involve [] use of a minor in a sexual performance." *See* 34 U.S.C. § 20911(3)(A)(iv) (defining Tier II offenders); U.S.S.G. § 2A3.5; PSR at ¶ 29. Accordingly, Mr. Hudson cannot be classified as Tier II sex offender, and instead is a Tier I sex offender subject to a base offense level of 12. Adjusted for acceptance of responsibility, his total offense level should be 10, and his range of incarceration assuming a criminal history category of V is 21 to 27 months.

a.    **Mr. Hudson's Offense Is Not a Categorical Match to Any of The Offenses Listed in § 20911(3)(A), Which the Government Concedes.**

The Ninth Circuit in *United States v. Cabrera-Gutierrez*, 756 F.3d 1125, 1133 (9th Cir. 2014) recognized that the categorical approach applies to determine the tier-level of a prior sex offense.[2] As it explained, "[t]he prior conviction may operate as a predicate if it defined more narrowly than, or has the same elements as, the generic federal crime. If, however, the statute defining the predicate offense 'sweeps more broadly than the generic [federal] crime,' the prior offense cannot serve as a statutory predicate."[3] *Id.* "[T]he 'key' to this comparison is 'elements, not facts.'" *Id.*; *Descamps v. United States*, 570 U.S. 254, 260–61 (2013).

The PSR does not engage in a categorical analysis before concluding that Mr. Hudson is a Tier II offender. *See* PSR at ¶ 25-29. Engaging in the requisite categorical analysis, it is clear that Mr. Hudson's offense of conviction—W. Va. Code § 61-10-31 conspiracy to violate § 61-8C-2(c), use of minors to film sexually explicit conduct—is not "defined more narrowly than," nor "has the same elements as, the generic federal crime" of conspiracy to commit abusive sexual contact in violation of 18 U.S.C. §

---

[2] This is consistent with how other Circuits have determined tier classifications of state sex offenses. *See, e.g., United States v. Walker*, 931 F.3d 576, 579 (7th Cir. 2019) (Barrett, J.) ("Because SORNA instructs us to compare Walker's offense to the "offenses" described in corresponding sections of the Federal Criminal Code (18 U.S.C. § 2244 and offenses listed therein), we employ the "categorical approach."); *United States v. Navarro*, 54 F.4th 268, 278–79 (5th Cir. 2022) ("To determine whether an offender's predicate offense is "comparable" to a crime listed in SORNA, we use the "categorical approach" that is familiar to federal criminal law."); *United States v. Berry*, 814 F.3d 192, 196 (4th Cir. 2016) (same).

[3] Stated differently, "[i]f a state law proscribes the same amount of or less conduct than that qualifying [under federal law], then the two offenses are a categorical match." *United States v. Martinez–Lopez*, 864 F.3d 1034, 1038 (9th Cir. 2017) (en banc)

2244. When comparing an attempt or conspiracy to commit a substantive state offense with a federal offense, the Ninth Circuit generally follows a two-comparison approach––first comparing whether the state conspiracy statute is a categorical match to (or narrower than) generic conspiracy, and second comparing whether the substantive offense is a categorical match to (or narrower than) the substantive federal offense. *See*, *e.g.*, *Rebilas v. Mukasey*, 527 F.3d 783, 787 (9th Cir. 2008) ("To hold that Rebilas's conviction was categorically a conviction for attempted sexual abuse of a minor under 8 U.S.C. § 1101(a)(43)(A) and (U), we would have to hold not only that Arizona's definition of public sexual indecency to a minor under ARS § 13–1403(B) was categorically sexual abuse of a minor, but also that Arizona's definition of attempt under ARS §§ 13–1001 was a categorical match with the federal definition of attempt."); *United States v. Gomez-Hernandez*, 680 F.3d 1171, 1175 (9th Cir. 2012) ("[W]e must determine whether the defendant's conviction establishes that he committed the elements of the generic definition of 'attempt' *and* that the underlying offense he attempted meets the generic definition of that offense.").

First, in order to be convicted of W. Va. Code § 61-10-31, the government must prove (1) "the defendant agreed with others to commit an offense against the State," and (2) "that some overt act was taken by a member of the conspiracy to effect the object of that conspiracy." *State v. Minigh*, 224 W. Va. 112, 121 (2009); *State v. Less*, 170 W.Va. 259 (1981); *see* W. Va. Code § 61-10-31. Generic conspiracy requires an agreement between at least two co-conspirators to achieve an unlawful objective and some overt act taken by a member of the conspiracy to effect the object of that conspiracy. Mr. Hudson assumes *arguendo* that § 61-10-31 is a categorical match to a generic definition of "conspiracy." The question, however remains whether the substantive offense, § 61-8C-2 is a categorical match to § 2244.

Second, West Virginia Code § 61-8C-2(c), requires the government to prove that (1) a parent, legal guardian or person having custody and control of a minor, (2)

photographed or filmed such minor in any sexually explicit conduct or caused, knowingly permitted, used, persuaded, induced, enticed or coerced such minor child to engage in or assist in any sexually explicit act.

§ 2244(a), by contrast, requires the government to prove that the defendant (i) knowingly engaged in or caused (ii) "sexual contact," which is statutorily defined in 18 U.S.C. § 2246(3), (iii) with or by another person, (iv) "if doing so would violate" any one of six cross-referenced offenses "had the sexual contact been a sexual act." *See* 18 U.S.C. § 2244(a). As relevant here,[4] those cross-referenced offenses prohibit knowingly engaging in a sexual act with another person if that person: is "incapable of appraising the nature of the conduct," § 2242(2)(A); knowingly engaging in a sexual act with another person without that person's consent, to include doing so through coercion, § 2242(3); or knowingly engaging in a sexual act with another person who "has attained the age of 12 years but has not attained the age of 16 years" and "is at least four years younger than the person so engaging," § 2243(a). *See id.* § 2244(a)(2), (3). Additionally, under § 2244(b), the government must prove that the defendant (1) knowingly engaged in (2) sexual contact with another person (3) without that person's permission.

Here, the West Virginia statute sweeps far more broadly including because (1) it contains *no mens rea* or mental state whatsoever and essentially operates as a strict liability offense whereas the federal offense requires proof of two *mens rea*, and (2) it punishes far more conduct than does the federal statute:

> **Mens Rea/Mental State**: the government must prove two different *mens rea* to obtain a conviction under 18 U.S.C. § 2244. First, § 2244(a), including all of its cross referenced offenses, and § 2244(b) all require proof that the defendant

---

[4] The offenses referenced in § 2244(a) that Mr. Hudson contends are not relevant are: §§ 2241(a) or (b) [mentioned in § 2244(a)(1)]; §§ 2242(1) or 2242(2)(B) [mentioned in § 2244(a)(2)]; § 2243(b) [mentioned in § 2244(a)(4)]; § 2241(c) [mentioned in § 2244(a)(5)]; or § 2243(c) [mentioned in § 2244(a)(6)].

acted "knowingly." Second, the definition of "sexual contact" set forth in 18 U.S.C. § 2246(3) requires the government to prove that the defendant committed the "sexual contact" with a specific "intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." West Virginia Code § 61-8C-2(c), by contrast, contains no *mens rea* other than if a defendant knowingly permitted a minor child to engage in or assist in any sexually explicit act, and thus operates like a strict liability offense. [5]

   *Actus Reus/Conduct*: Regardless of which of the relevant offenses listed in § 2244(a) or (b) one selects, West Virginia Code § 61-8C-2(c) is broader because the state statute penalizes far more conduct than does 18 U.S.C. § 2244. Specifically, the definition of "sexually explicit conduct" used in § 61-8C-2(c) is much broader than the federal definition of "sexually abusive contact" in § 2246(3). Under § 2244, the government must prove that the defendant engaged in "sexual contact" meaning "the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(3). By contrast, West Virginia defines "sexually explicit conduct" as either "actually performed or *simulated*: (1) Genital to genital intercourse; (2) Fellatio; (3) Cunnilingus; (4) Anal intercourse; (5) Oral to anal intercourse; (6) Bestiality; (7) Masturbation; (8) Sadomasochistic abuse, including, but not limited to, flagellation, torture or bondage; (9) Excretory functions in a sexual context; or (10) Exhibition of the genitals, pubic or rectal areas of any person in a sexual context." W. Va. Code § 61-8C-1. The state statute sweeps more broadly than the federal offense because

---

   [5] *See Outmezguine v. State*, 335 Md. 20, 48, 641 A.2d 870, 884 n. 19 (1994) (citing W. Va. Code § 61-8C-2 and stating that "12 jurisdictions make no mention of scienter in their child pornography statutes and thus presumably also operate as strict liability crimes.").

in West Virginia, a person could be prosecuted for (1) *simulated* conduct as opposed an actual "intentional touching," and (2) conduct like excretory functions or exhibition of genitals that would not require any touching of the areas set forth in § 2246(3) at all.

Accordingly, as to both the *mens rea*/mental state and the *actus reus*/conduct, the state statute "sweeps more broadly" than § 2244. Mr. Hudson, thus, cannot be a tier II sex offender on that basis. Numerous courts have rejected finding that a defendant was a tier II sex offender because that individual's state offense categorically penalized more conduct than § 2244, including because the state offense did not require actual touching. *See*, *e.g.*, *United States v. White*, 782 F.3d 1118, 1136-1138 (10th Cir. 2015) (North Carolina conviction for taking indecent liberties with a child swept too broadly because it did not require actual touching and was not a categorical match to § 2244; defendant, thus, could not be a Tier II offender); *Walker*, 931 F.3d at 581-82 (Barrett, J.) (Colorado conviction for sexual contact with a child under age 15 by anyone at least four years older swept too broadly and was not a categorical match to § 2244; defendant could not be classified as a Tier II offender). For its part, the government *concedes* that Mr. Hudson's "conviction is not a categorical match to any of the offenses listed in 20911(3)(A)." *See* Gov. Sentencing Memo at 3.

### b. The Categorical Approach Applies to Tier Determinations Under § 20911(3)(B), And As Such, Hudson's Offense Did Not "Involve" "Use of a Minor In a Sexual Performance"

The PSR and government contend, alternatively, that Mr. Hudson is a Tier II offender because his offense of conviction "involved use of a minor in a sexual performance," or "production of child pornography" which qualifies him as a Tier II offender. *See* 34 U.S.C. § 20911(3)(B); PSR at ¶ 29; Gov. Sentencing Memo at 3, 5. To reach that conclusion, the government advocates that the Court adopt a circumstance specific approach. *See* Gov. Sentencing Memo at 3, 5. Not only would application of

7

the circumstance specific approach to § 20911(3)(B) break new ground and be at odds with the categorical interpretation of the sister provision, § 20911(3)(A), discussed above, it would be contrary to the plain language of the statute.

As a threshold matter, ***no court*** has ever held that the circumstance specific approach applies to 34 U.S.C. § 20911(3)(B), something the government acknowledges. Gov. Sentencing Memo at 3-4. Adopting the circumstance specific approach here would be breaking new ground. It would also be anomalous given the plain text of the statute.

When engaging in statutory construction, the plain, unambiguous language of the statute controls. *See United States v. Williams*, 659 F.3d 1223, 1225 (9th Cir. 2011). The plain language leads to only one conclusion: that the categorical approach applies.

***First,*** the word "***offense***" in § 20911(3)'s prefatory language—"The term 'tier II sex offender' means a sex offender other than a tier II sex offender whose ***offense*** is punishably by imprisonment for more than 1 year and"—is suggestive of a categorical mode of analysis. *See United States v. Davis*, 139 S. Ct. 2319, 2328 (2019) (use of "offense" in prefatory language of 18 U.S.C. § 924(c)(3) indicated a categorical approach applied). In *Davis*, before striking down 18 U.S.C. § 924(c)(3)(B) as unconstitutionally vague, the Supreme Court considered whether § 924(c)(3)(B) mandated a categorical or circumstance specific approach.[6] Explaining that the prefatory language of the statute used the word "offense" and that the Court had already held that its sister provision, 18 U.S.C. § 924(c)(3)(A) required a categorical approach, the Court explained that "absent evidence to the contrary, we presume the

---

[6] While 18 U.S.C. § 924(c)(3)(B) had long been interpreted to require a categorical approach, the government reversed course and began arguing that a circumstance specific approach applied instead to save the provision from being struck down as unconstitutionally vague. *See Davis*, 139 S. Ct. at 2326-2327. The Supreme Court rejected that interpretation and held that § 924(c)(3)(B) required a categorical interpretation based on the plain language of the statute. *See id.*

term is being used consistently[,]" meaning that the categorical approach also applied to § 924(c)(3)(B). *Davis*, 139 S. Ct. at 2328 ("[W]e would expect 'offense' to retain that same meaning in connection with the residual clause [of 924(c)(3)(B)].""). Accordingly, the Court held that the plain language of § 924(c)(3)(B) mandated a categorical approach—an interpretation that lower courts had long held. *See id*.

**Second,** 20911(3)(B)'s use of the word "***involves***" in the **present** tense further supports applying a categorical approach. In *Davis*, the Supreme Court explained that use of the term "involves," did not favor a circumstance specific approach because "it is just as natural to ask whether the offense of robbery *ordinarily* 'involves' a substantial risk that violation will be used 'in the course of committing the offense' as it is to ask whether a *particular* robbery 'involved' a substantial risk that violence would be used 'in the course of committing the offense.'" 139 S.Ct. at 2335 (original emphasis). To the contrary, the *Davis* Court explained that "[i]f anything, the statute's use of [the word 'involves' in] the **present** and not the **past** tense lends further support to the categorical reading." *Id*. (emphasis supplied); *see also Nijahawan v. Holder*, 557 U.S. 29, 36 (2009) (the phrase "'*involv[e] conduct* that presents a serious potential risk of physical injury to another'…refers to crimes as generically defined." (original emphasis)).

**Third,** a list of ***offenses***—not circumstances as the government contends (*see* Gov. Sentencing Memo at 5)—follows the word "involves." Like § 20911(3)(A), this mandates use of the categorical approach. *See Walker*, 931 F.3d at 579 ("Because SORNA instructs us to compare Walker's offense to the "offenses" described in corresponding sections of the Federal Criminal Code (18 U.S.C. § 2244 and offenses listed therein), we employ the 'categorical approach.'"). Use of a minor in a sexual performance—like solicitation of a minor to practice prostitution, production of child pornography, and distribution of child pornography—are all *offenses*, not circumstances. In fact, numerous states have *offenses* for use of a minor in a sexual

9

performance in addition to offenses for solicitation, and production and distribution of child pornography. *See*, *e.g.*, N.Y. Penal Law § 263.05 (entitled "Use of a child in a sexual performance"); Ky. Rev. Stat. Ann. § 531.310 (entitled "Use of a minor in a sexual performance"); N.D. Cent. Code Ann. § 12.1-27.2-02 (entitled "Use of a minor in a sexual performance"); Minn. Stat. Ann. § 617.246 (entitled "Use of minors in sexual performance prohibited"); D.C. Code Ann. § 22-3102 ("A person is guilty of the use of a minor in a sexual performance if…"); Fla. Stat. Ann. § 827.071 ("A person is guilty of the use of a child in a sexual performance if…"); Cal. Penal Code § 311.4 (entitled "Unlawful use of a minor" and penalizing use in a sexual performance).[7]

Here, § 20911(3)(B)'s use of the word ***"involves"*** in the ***present tense*** followed by a list of ***offenses***, both of which follow the use of the word ***"offense"*** in the

---

[7] Similarly, and as common sense dictates, there are *offenses* of solicitation of a minor to practice prostitution, production and distribution of child pornography. *See*, *e.g.*, Cal. Penal Code § 647(b)(3) (penalizing "An individual who solicits…any act of prostitution with another person who is a minor…"); Haw. Rev. Stat. Ann. § 712-1209.1 (2016) (entitled "Solicitation of a minor for prostitution" before being renamed to "commercial sexual exploitation of a minor"); N.C. Gen. Stat. Ann. § 14-205.1 (punishing "Any person 18 years of age or older who willfully solicits a minor for the purpose of prostitution is guilty of a Class G felony."); Minn. Stat. Ann. § 609.324 (entitled "Engaging in, hiring, or agreeing to hire minor to engage in prostitution"); Tenn. Code Ann. § 39-13-528 (penalizing solicitation of a minor to patronize or promote prostitution); S.C. Code Ann. § 16-15-342 (entitled "Criminal solicitation of a minor"); La. Stat. Ann. § 14:83 ("Whoever commits the crime of soliciting for prostitutes when the person being solicited is under the age of eighteen years…"); Tex. Penal Code § 43.03; 18 U,S.C. § 2251 (entitled "Sexual exploitation of children" and penalizing production of child pornography); 18 U.S.C. §2260 (entitled "Production of sexually explicit depictions of a minor for importation into the United States."); Cal. Penal Code § 311.1 (production and distribution of child pornography); N.Y. Penal Law § 263.05 ("Promoting an obscene sexual performance by a child"); 720 ILCS 5/11-20.1 (production and distribution of child pornography); 18 U.S.C. § 2252 (distribution of child pornography), 18 U.S.C. § 2252A (same); Fla. Stat. Ann. § 847.0371 (distribution of child pornography); Haw. Rev. Stat. Ann. § 707-751 (penalizing "disseminating child pornography").

prefatory language, means that the categorical approach applies, consistent with the categorical interpretation of its sister provision in § 20911(3)(A). While the government points to a single use of the word "involves" and what it erroneously calls a "list of circumstances," and cites to pre-*Davis*, non-precedential case law—use of that word *favors* the categorical approach for the reasons explained in *Davis*, As the government fails to come forward with anything else that would rebut the "presumption" that use of the term "offense" in the prefatory language of § 20911(3) bears a consistent meaning in both §§ 20911(3)(A) and (B), the categorical approach applies here. *See Davis*, 139 S. Ct. at 2328.

Applying the categorical approach, the government bears the burden of proving that Mr. Hudson's offense of conviction— a violation of W. Va. Code § 61-10-31— matches the categorical definition of "use of a minor in a sexual performance" or "production of child pornography." As W. Va. Code § 61-10-31 only requires proof that (1) "the defendant agreed with others to commit an offense against the State," and (2) "that some overt act was taken by a member of the conspiracy to effect the object of that conspiracy[,]" *Minigh*, 224 W. Va. at 121, his offense of conviction would not match either categorical definition[8] Mr. Hudson, thus, cannot be a Tier II offender, and instead is a Tier I offender.[9] The base offense level should be 12, not 14.

---

[8] The relevant comparison is W. Va. Code § 61-10-31, not § 61-8C-2(c), because the conspiracy provision is what Mr. Hudson was actually convicted of. W. Va. Code § 61-8C-2(c) only became relevant in doing a categorical analysis under § 20911(3)(A) because that provision specifically included "attempt or conspiracy." *See* 34 U.S.C. § 20911(3)(A). Section 20911(3)(B) does not include "attempt or conspiracy" in the plain language of that provision.

[9] If nothing else, 34 U.S.C. § 20911(3) is vague, and the Rule of Lenity should be applied in Mr. Hudson's favor. *United States v. Millis*, 621 F.3d 914, 917 (9th Cir. 2010) (applying Rule of Lenity to ambiguous criminal statute).

1
2

## C.    Objections to Guidelines Calculation of Supervised Release Term and Certain Proposed Conditions of Supervised Release

3
4

Mr. Hudson objects to the Guidelines calculation of the applicable term of supervised release as well as Proposed Conditions #11, 15.

5
6

### 1.    The Guidelines Recommend Five Years, Not a Lifetime Period of Supervised Release

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

The Guidelines' range for the term of supervised release is incorrectly calculated at life. Specifically, Probation asserts that "the policy statement at USSG § 5D1.2(b)(2) recommends that the statutory maximum term of supervised release be imposed in sex offense cases." ECF No. 32 at 10. Mr. Hudson's statute of conviction—18 U.S.C. § 2250 for failing to register as a sex offender—is ___not___ a sex offense. Indeed, the definition of "sex offense" set forth in Application Note 1 of U.S.S.G. § 5D1.2(b)(2) makes explicitly clear that it "does ___not___ include an offense under 18 U.S.C. § 2250 (Failure to register)." The Policy Statement, thus, does *not* recommend that a defendant convicted of failing to register under § 2250 be sentenced to the statutory maximum term of supervised release, which in Mr. Hudson's case is life. The proper advisory term of supervised release under the Sentencing Guidelines is set forth in § 5D1.2(c), which is the minimum term set by statute in 18 U.S.C. § 3583(k) of five years. U.S.S.G. § 5D1.2(c); *see also* § 5D1.2, cmt. n.6 (explaining that when "the relevant statute requires a minimum term of supervised release of five years and a maximum term of life, the term of supervised release provided by the guidelines is five years"); *United States v. Agritelly*, 665 F. App'x 109, 111 (2d Cir. 2016) (explaining that "the recommended Guidelines term of supervised release for a violation of § 2250 is five years" and holding that it was plain error to impose a lifetime term of supervised

25
26
27
28

release).[10] The correct Guidelines range for the term of supervised release should be five years.

### 2.    Proposed Condition #11 Is Unconstitutional, Especially When Imposed For Life

Proposed Condition #11 permits Mr. Hudson to be searched and seized without any cause whatsoever by any law enforcement officer night or day for *his entire life*. Mr. Hudson objects as this would be a ***complete*** nullification of his Fourth Amendment rights, and therefore unconstitutional, and because it is contrary to what 18 U.S.C. § 3583(d)(3) and U.S.S.G. § 5D1.3(7)(C) recommend.

First, a warrantless and suspicionless search condition is not reasonably related to the facts of this case nor Mr. Hudson's background. 18 U.S.C. § 3583(d)(1). Mr. Hudson's offense is for failing to register. There are no allegations that he used electronic devices to commit this offense, nor would a warrantless search or seizure uncover evidence of a future violation. To the contrary, the government need only query a state's database to determine if Mr. Hudson was registered in that state. There is no reasonable relation between this offense and the condition. *See United States v. Kelly*, 630 F. App'x 416, 421-22 (6th Cir. 2015) (vacating search condition imposed for a failure to register offense after holding that a search condition did not "do anything to address [the] risk" of defendant absconding or failing to register).

Further, there is nothing in Mr. Hudson's criminal history that would likewise support such a condition. Apart from his sex offense, which occurred in 2010 (PSR at ¶ 54), his criminal history is for failing to register, traffic offenses, and battery. A suspicionless search and seizure condition would do little to deter or address any risks associated with these types of offenses. As to Mr. Hudson's sex offense, it is more than 13 years old and there are no allegations that he has engaged in any conduct remotely

---

[10] On remand and at resentencing, the District Court imposed a five year term of supervised release. *United States v. Agritelly*, No. 14-cr-00090, ECF No. 70 (D. Conn. Aug. 31, 2017).

13

similar since then. Indeed, the Sentencing Order suspending Mr. Hudson's sentence and granting him probation specifically noted that a licensed psychologist, Dr. William Fremouw, Ph.D., had found Mr. Hudson to present " a low to moderate risk to reoffend." Ex. A at 2. His history since then confirms that he has posed little risk, if any.

While Mr. Hudson does have prior controlled substance offenses, they are more than 20 years old. Nothing in Mr. Hudson's background warrants warrantless and suspicionless searches and seizures for five years after he is released from custody, let alone *for the rest of his life*. As such, this Proposed Condition #11 is a far "greater deprivation of liberty than is reasonably necessary to protect the public." 18 U.S.C. § 3583(d)(2).

At a minimum, such a condition should be limited only for the advisory five year term of supervised release and only when there is ***reasonable suspicion*** that violation of a condition of supervised release or unlawful conduct by Mr. Hudson has occurred. Not only is this what 18 U.S.C. § 3583(d)(3) allows, the Guidelines also recommend that such a condition be limited to when there is reasonable suspicion. *See* U.S.S.G.§ 5D1.3(7)(C).

### 3.    Proposed Condition #15 Is An End-Run Around SORNA and Not Reasonably Necessary Once the SORNA Term Has Expired

Mr. Hudson also objects to Proposed Condition #15 requiring him to keep his registration current for the rest of his life as a condition of supervised release. He objects based on federalism grounds and because such a condition is a greater deprivation of liberty than is reasonably necessary to protect the public. 18 U.S.C. § 3583(d)(2).

Congress saw fit to give the federal government a limited time period in which to prosecute individuals federally for failing to register. Specifically, under SORNA, Congress may only prosecute an individual federally for failing to register for 15 years

14

if that person is a Tier I offender or 25 years if the person is a Tier II offender. *See* 34 U.S.C. § 20915. Only if a person qualifies as a Tier III sex offender may they be prosecuted federally for the rest of their life for failing to register.[11] *See id*.

As discussed above, Mr. Hudson is a Tier I offender and could only be prosecuted for violating § 2250 for 15 years (ten of which have already passed). By requiring as a condition of supervised release that Mr. Hudson keep his state registration current *for the rest of his life*, the federal government is essentially doing an end-run around SORNA, and its statutory time limitations, by allowing him to be prosecuted federally for the rest of his life for failing to keep his state registration current as a condition of supervised release. *See Carr v. United States*, 560 U.S. 438, 452 (2010) ("It is similarly reasonable for Congress to have given the States primary responsibility for supervising and ensuring compliance among state sex offenders and to have subjected such offenders to federal criminal liability only when, after SORNA's enactment, they use the channels of interstate commerce in evading a State's reach.").

Moreover, this Proposed Condition is also a "greater deprivation of liberty than is reasonably necessary to protect the public." 18 U.S.C. § 3583(d)(2). A licensed psychologist found Mr. Hudson to pose a "low to moderate risk" of re-offending a decade ago. Ex. A at 2. In the thirteen years since that offense took place, he has not engaged in ***any*** alleged or proven acts of sexual misconduct. To subject him not only to state penalties for failing to register, but also revocation of a lifetime term of supervised release and federal incarceration is an enormous deprivation of liberty that is not reasonable in light of the remoteness of his sex offense and the low risk, if any, of

---

[11] Of course, these provisions do not bar the States from setting different timeframes for state registration requirements and prosecuting individuals for not complying with those requirements. Indeed, as the Supreme Court noted in *Carr v. United States*, § 2250 is just one provision in a broad statutory scheme primarily relying on states to track state sex offenders, and that § 2250 was meant to play a limited role. *Carr v. United States*, 560 U.S. 438, 452, 455-56 (2010).

recidivism. Accordingly, Mr. Hudson objects and requests that the Proposed Condition be limited to five years, which is the supervised release term recommended by the Guidelines and also approximately the amount of time that he has remaining under SORNA.

### III. SECTION 3553(A) FACTORS SUPPORT A SENTENCE OF 18 MONTHS FOLLOWED BY FIVE YEARS OF SUPERVISED RELEASE

The Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220 (2005), *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), rendered the Sentencing Guidelines advisory in favor of courts considering the Guidelines in connection with the factors set forth in the Sentencing Reform Act ("SRA"), 18 U.S.C. § 3553(a) ("Section 3553(a)"). See *Booker*, 543 U.S. at 244–46. In doing so, the Supreme Court "breathe[d] life into the authority of district court judges to engage in individualized sentencing." *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008). As set forth below, there are compelling reasons under the SRA for the Court to consider a sentence of 18 months incarceration followed by a five year term of supervised release, which represents a modest three month variance from the low-end of the applicable Guidelines range of 21 to 27 months followed by five years of supervised release.

### A. Mr. Hudson's History and Characteristics

A father is supposed to protect his son. But for Danny Douglas Hudson, being his father's son was a living nightmare. The stack was decked against Mr. Hudson from the very start. Though he did not choose it, he was born with schizophrenia—a disease he likely inherited from his father, who was undiagnosed. *See* PSR at ¶¶ 88, 109. He also inherited his father's alcoholism. *Id*. at ¶¶ 88, 117. And to top things off, his father physically, sexually, and verbally abused him from the young age of five until he was

eleven years old—that is, when his father chose to be around rather than leave his family completely destitute. *Id.* at ¶¶ 83-85, 89.

Trying to create a better life for himself outside of West Virginia and escape the demons of his past, Mr. Hudson enlisted in the military at age 17, specifically the Marine Corps, and honorably served his country. *Id.* at ¶ 127. He left three years later after his schizophrenia began rearing its ugly head—when he describes "[s]omething in my head broke." *Id.* at ¶¶ 90, 127. Sadly, instead of getting proper medical treatment, Mr. Hudson dealt with the symptoms the same way his father had—by self-medicating excessively with alcohol. *Id.* at ¶¶ 90-91, 111, 116-117. His schizophrenia went mostly untreated the rest of his life until his arrest on the instant charge. The few pieces of stability that Mr. Hudson had—like a home, a job, a family of his own—slowly began crumbling as he became increasingly lost to his delusions and the blur of alcoholism.

Not surprisingly, Mr. Hudson also began picking up criminal cases—the majority of which were offenses connected with his use of alcohol. In 2010, after he had met his now-wife Sadie, Mr. Hudson and his wife made the fateful decision to engage in a very misguided plot to get back at his brother and ended up committing a sex offense. Though no excuse, Mr. Hudson explained that "[a]lcohol played a big part in that decision. I don't think any of it would have happened [without alcohol]." *Id.* at ¶ 54. The sentencing judge ultimately suspended Mr. Hudson's 1-5 year sentence and sentenced him to probation, recognizing that he was remorseful for his actions and cooperative during the presentence investigation, and that he posed a "low to moderate risk" of re-offending. Ex. A at 2. Demonstrating that he learned his lesson, there have been no allegations that Mr. Hudson has ever engaged in any remotely similar conduct following that offense.

Fast forward to the last few years of their lives, Mr. Hudson and his wife have largely been homeless, living in a tent or shelters, and carving out a meagre existence by collecting and recycling bottles and cans they would find on the streets. His mental

illness has gone untreated, and so Mr. Hudson unfortunately would use what little money they earned through recycling to buy bottles of vodka. In the year before his arrest, he was drinking "three to four pints of alcohol daily, seven days a week, and smoking two to three grams of marijuana daily[,]" all to quell his auditory and visual hallucinations and to help him sleep without experiencing night terrors. PSR at ¶¶ 110, 113 117. Mr. Hudson fully recognizes that his alcohol use is a huge problem and acknowledges that it has posed the biggest obstacle in his life. *Id.* at ¶ 115. He credits this case, and the treatment he has received while in pretrial custody, with opening his eyes, providing clarity of mind, and giving him a new perspective on life moving forward. Indeed, as he explained during his presentence interview, Mr. Hudson wants nothing more than "to find a job to help get some stability in my life and I want to keep up with my mental health treatment, so I don't go back to using alcohol." *Id*. at ¶ 100. Mr. Hudson has a plan to achieve those goals when he is released from custody. *See* Ex. B.

## B.     Nature and Circumstances of the Offense Conduct

The core evil that § 2250 was designed to punish was a sex offender traveling *with the purpose of* evading one's registration requirements. *See Carr*, 560 U.S. at 452. Mr. Hudson fully acknowledges that he violated § 2250 by traveling and failing to update his registration, and fully accepts responsibility for his actions. But there is no evidence here that he committed the offense with the nefarious purpose of evading his registration obligations or that he opportunistically took advantage of his failure to register to engage in any sexual misconduct. Indeed, it is important not to overlook that Mr. Hudson ***substantially complied*** with his registration obligations for a significant period of time before the instant offense, although he acknowledges that his compliance was not perfect. In fact, the discovery shows that Mr. Hudson registered in West Virginia multiple times in 2013, 2014, 2015, 2017 and 2021. Additionally, the PSR notes that Mr. Hudson registered in California in 2018 and in 2021, submitted a change

18

of address indicating that he was going to relocate to West Virginia, where he subsequently registered. *See* PSR at ¶¶ 16 n.4, 98.

Equally important to consider is that even after Mr. Hudson failed to register, he did not opportunistically use that failure to engage in any sexual misconduct or other illegal conduct. Indeed, there are no allegations that since the 2010 sex offense, that Mr. Hudson has ever engaged in any remotely similar behavior. To the contrary, it is clear that at the time that he failed to register, Mr. Hudson was homeless, living with significant untreated mental illness while heavily self-medicating with alcohol, all of which contributed to his failure to register. PSR at ¶¶ 99, 117. Given the turmoil he was dealing with at the time, fulfilling his registration obligations unfortunately was not at the forefront of his consciousness. He deeply regrets that he did not prioritize complying with his registration obligations (particularly given his long track record of registering beforehand and despite having been previously prosecuted for failing to register), and he recognizes that he must do better in the future. But such a failure was not done with a nefarious purpose, nor did Mr. Hudson take ill advantage of law enforcement not knowing his whereabouts. Given this and given Mr. Hudson's very early acceptance of responsibility not even two months after being arrested, 18 months imprisonment is sufficient but not greater than necessary to punish Mr. Hudson.

**C.    Need for Deterrence and to Promote Respect for the Law**

18 months imprisonment followed by five years of supervised release is sufficient to deter Mr. Hudson and promote respect for state and federal registration requirements. While he acknowledges that his compliance with registration requirements has been less than perfect, Mr. Hudson's previous track record of registering including the year before the offense demonstrates that he respects the law. *See* PSR at ¶¶ 16 n.4, 98. A lengthy term of imprisonment is not needed to instill that respect in him.

19

As far as the need to deter, 18 months is sufficient to do that. Mr. Hudson has suffered greatly being apart from his beloved wife. She is his purpose for living. PSR at ¶ 109. He will continue to be apart from her until he finishes serving his sentence, and it terrifies him to know that she will be on her own to navigate our complicated world while he finishes his term of incarceration. He is, thus, acutely aware that if either he or his wife fail to register in the future, that it will only lead to them being incarcerated and separated again, which incentivizes both of them to comply with registration requirements going forward so that they can stay together. A longer term of incarceration, thus, will not add any additional measure of deterrence.

Additionally, it is important to remember that there were multiple, extenuating circumstances that contributed to Mr. Hudson's commission of the offense, including his homelessness, untreated mental illness and self-medication with alcohol. Mr. Hudson wants to stabilize his life. PSR at ¶ 100. He has made positive strides toward the goal already by getting proper mental health treatment so that he is not self-medicating with alcohol. He has a plan for when he is released including residing at a sober living home for couples, obtaining a job, and continuing his mental health treatment, all of which ensures he does not end up in the same circumstances as when the offense was committed. *See* Ex. B. All of this mitigates the risk of recidivism and thus reduces the need for a lengthy period of incarceration. 18 months incarceration with a five year term of supervised release fulfills the goal of deterrence and promoting respect for the law. Beyond the five years of supervised release, Mr. Hudson will continue to be required to register with the state, which will provide an additional level of supervision.

### D.    Need to Avoid Unwarranted Sentencing Disparities

A custodial term of 18 months would not result in an unwarranted sentencing disparity. While 18 months is a modest three-month variance from the low-end of correct Guidelines advisory range, it is not an unwarranted disparity. Mr. Hudson is

someone who has substantially complied with his registration requirements for many
years prior the instant offense. The offense was not committed with a nefarious
purpose. Further, the circumstances surrounding the offense show that Mr. Hudson was
experiencing tremendous personal adversity in being homeless, coping with untreated
mental illness, and struggling with alcohol addiction. These circumstances warrant a
very modest variance in his period of incarceration.

As to his term of supervised release, a five-year term is within the Guidelines
range when the Sentencing Guidelines are correctly calculated. Additionally, numerous
other cases have imposed a five year term for failing to register. *See*, *e.g.*, *United States
v. Berry*, 814 F.3d 192, 194 (4th Cir. 2016) (noting district court sentenced defendant to
five years of supervised release for failing to register under § 2250); *United States v.
Garcia*, 604 F.3d 575, 576 (8th Cir. 2010) (noting district court sentenced defendant to
28 months custody followed by 5 years of supervised release); *United States v.
Agritelly*, No. 14-cr-00090, ECF No. 70 (D. Conn. Aug. 31, 2017) (24 months
imprisonment followed by five years of supervised release); *United States v. Hart*, No.
12-cr-00004, ECF No. 36 (D. Guam Nov. 13, 2013) (21 months imprisonment followed
by 5 years of supervised release); *United States v. Urango*, No. 18-cr-00071, ECF No.
32 (E.D. Okla. Oct. 24, 2019) (18 months imprisonment followed by 5 years of
supervised release); *United States v. Sanders*, No. 19-cr-00064, ECF No. 36 (E.D.
Okla. Feb. 4, 2020) (same); *United States v. Payne*, No. 19-cr-00041, ECF No. 41 (E.D.
Okla. Oct. 5, 2020) (33 months followed by 5 years supervised release). 18 months
imprisonment followed by a five-year term of supervised release would not result in an
unwarranted disparity.

///

///

21

# IV. CONCLUSION

For the foregoing reasons, Danny Douglas Hudson respectfully asks this Court to sentence him to 18 months incarceration to be followed by a five-year term of supervised release.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  July 17, 2023                    By: */S/ Jaya Gupta* .
JAYA GUPTA
Deputy Federal Public Defender

22

EXHIBIT "A"

IN THE CIRCUIT COURT OF PRESTON COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA

vs.                                    // CASE NO. 13-F-4
                                       JUDGE LAWRANCE S. MILLER, JR.

DANNY DOUGLAS HUDSON,
           Defendant.


### SENTENCING ORDER
### SUSPENDING EXECUTION OF SENTENCE AND
### GRANTING PROBATION

On October 1, 2013, came the State of West Virginia by Melvin C. Snyder III, Prosecuting Attorney of Preston County, and the defendant, Danny Douglas Hudson, in person and by his attorney, Cheryl L. Warman, for a sentencing hearing in the above-styled matter, with the Honorable Lawrance S. Miller, Jr., presiding. Also in attendance was Todd Schell, Probation Officer.

Previously, on August 8, 2013, pursuant to a plea agreement, the defendant entered a guilty plea to Conspiracy to Commit the Offense of Use of Minors to Film Sexually Explicit Conduct. Additionally, on that date the Court Ordered the preparation of a Pre-Sentence Investigation Report by the Probation Office and a Victim Impact Statement.

At the outset of today's hearing the Court noted that a Sex Offender Presentencing Evaluation, prepared by Dr. William Fremouw, Ph.D., licensed psychologist, had been filed on September 10, 2013, with copies furnished to the attorneys. Subsequently, on September 23, 2013, the Pre-Sentence Investigation Report prepared by the Probation Office was filed, with copies furnished to the attorneys. Today the State tendered to the Court a one-page Victim Impact Statement, marked as State's Exhibit 1, a copy of which had been provided to counsel for the defendant, and that document was admitted into evidence without objection by the defendant. Upon inquiry by the Court, the defendant indicated that he had read the Pre-Sentence Investigation Report and had reviewed its contents with his attorney. Counsel for the defendant informed the Court that no additions or corrections to the report were needed. Accordingly, the Court adopted as its findings the information set forth in the Pre-Sentence Investigation Report. The Court then noted that on August 8, 2013, it had entered an Order

MCS/Ms.
By Phone)  10/3/13

2

finding that the offense to which the defendant pled guilty was sexually motivated, and concluded that the defendant is required to register as sexual offender pursuant to West Virginia Code § 15-12-2(c). Therefore, at today's hearing the Court explained and provided in writing to the defendant a Notice and Acknowledgment of Sexual Offender Registration Requirements. The defendant read the aforesaid document and was given the opportunity to consult with his attorney about the contents thereof. After the Court ascertained that the defendant understood the document and its provisions, the defendant and his counsel affixed their signatures to the original, which was then entered by the Court and made a part of the official case folder, and copies thereof were furnished to the defendant and counsel. The defendant expressed his understanding that he will be required to maintain lifetime sexual offender registration, as the victim was a minor at the time of the offense.

The Court then considered the matter of the defendant's sentence. Counsel for the defendant requested that the defendant be placed on probation and argued that the defendant is a suitable candidate for such alternative. In accordance with the terms of the plea agreement, the State did not oppose probation.

Based upon the evidence presented the Court **ORDERS** that the defendant, Danny Douglas Hudson, for his conviction of the felony offense of **Conspiracy to Commit the Offense of Use of Minors to Film Sexually Explicit Conduct**, is hereby sentenced to an **indeterminate term of one (1) to five (5) years in the State Penitentiary**, with credit for time served, and he is assessed the costs of this proceeding. The Court does not impose a fine. For the following reasons, the Court finds that the defendant is an appropriate candidate for probation: (1) Probation has not been opposed by the State and has been recommended by the Probation Officer. (2) The defendant appears to be remorseful and was cooperative during the Presentence Investigation. (3) The defendant has a need for rehabilitation and treatment, which can be offered through services during a term of probation. (4) Dr. Fremouw's report opines that the defendant is at low to moderate risk to reoffend. (5) The defendant has been incarcerated since January 4, 2013. (6) As a sex offender the defendant will be subject to a high level of supervision during probation. Accordingly, the Court suspends execution of the sentence and **GRANTS** the defendant's request for probation. The Court **ORDERS** that the defendant shall be placed on **probation**, effective as of the date of entry of this Order, for a period of ___5___ **years**, under the following terms and conditions:

3

1. By the 15th day of each month, he shall make a complete and truthful written report to his Probation Officer of the previous month's activities and shall make personal visits to the Probation Office as directed.

2. He shall not violate any criminal laws of this or of any other state, or of the United States, or of any municipality.

3. He shall comply with the rules and regulations prescribed for his supervision by his Probation Officer, including written rules and reporting when directed.

4. He shall advise his Probation Officer when he has any substantial change in circumstances, such as: obtaining a motor vehicle operator's license, marrying, changing residence, changing employment, or leaving his county of residence for more than 24 hours.

5. He shall live only in an approved residence and is not to change residence without the prior permission of the Probation Office.

6. He shall not leave the State of West Virginia without first obtaining the written consent of his Probation Officer.

7. He shall notify his Probation Officer within 24 hours of any arrest or questioning by a law enforcement officer and shall inform his Probation Officer of all the facts and circumstances that brought about the arrest or questioning. If the Probation Office is closed, he must leave a message on the answering machine providing this information.

8. He shall report as requested to the Court or to the Probation Office. He shall permit a Probation Officer to visit his home, place of employment, or school. He shall answer truthfully all reasonable inquiries made by the Probation Officer. He shall submit to any and all searches of his person, residence, property or effects by a Probation Officer at any time the Probation Officer deems it necessary based upon a reasonable suspicion or safety concern, and he shall agree to the seizure of any property found or discovered as a result of the search.

9. He shall not attempt to alter, mask, or defeat any drug or alcohol test. He shall not have in his possession any product or substance that could alter his urine sample, nor shall he have in his possession any product or substance that when ingested could alter, mask, or defeat a drug or alcohol test. These products and substances include, but are not limited to, prosthetic devices, dehydrate urine, the urine of another, herbal cleansing products, herbal teas, products containing creatinine, or any product having or claiming to have similar effects. Additionally, he shall not have in his possession materials, written or otherwise, concerning these products or the use of such products.

4

10.  He shall obtain approval from his Probation Officer prior to using any over the counter medications or any nutritional, dietary, or herbal supplements, including those commonly used for weight loss or gain.

11.  He shall not possess obscene matter or child pornography, including but not limited to: videos, magazines, books, DVD's, and material downloaded from the internet. He shall not visit strip clubs, adult bookstores, motels specifically operated for sexual encounters, peep shows, bars where partially nude or exotic dancers perform, or businesses that sell sexual devices or aids.

12.  He shall not use, possess, or have in his residence any alcoholic beverages (including beer and wine), and he shall not enter any establishment that sells alcoholic beverages (including beer and wine) for consumption on the premises.

13.  He shall not use, possess, or have in his residence any narcotic, illegal drug, or controlled substance except pursuant to a valid prescription from a licensed physician. He shall immediately inform his Probation Officer of any and all prescriptions issued to him by a licensed physician.

14.  He shall sign consents for release of information for any and all health, mental health and substance abuse treatment providers, allowing the Probation Officer/Intensive Supervision Officer to monitor his progress and compliance with treatment recommendations.

15.  He shall pay all Court costs ordered by the Court, including any attorney fees paid by the State of West Virginia on his behalf.  He shall develop a payment plan with his Probation Officer based on his ability to pay.  His payments are to be due on the 1st day of each and every month, commencing with the month of October, 2013.

16.  He shall participate in any and all components of the Preston County Community Corrections Program deemed necessary by the Court, the Probation Officer, or the Community Corrections Supervisor.

17.  He shall use his best efforts to obtain and maintain a daily routine of constructive activities such as participation in a sheltered workshop, enrollment in an appropriate education/training program or part-time employment. If employed, he shall provide a copy of his pay stub with each monthly report. If he is not so engage he must complete community service as directed by his Probation Officer in an amount of up to 20 hours per week for each week that he is not so engaged.

5

18.  He shall not use, possess or have in his residence any firearm, ammunition, or dangerous or deadly weapon, including any air compression device.  He is advised that it is a federal and state law crime for a convicted felon to possess firearms or ammunition.  He shall not occupy a vehicle in which any such firearms or lethal weapons are present.

19.  He shall abide by any special written instructions imposed upon him by his Probation Officer.  The following are those written instructions:

A.   He shall cooperate with random testing for alcohol and/or drug use by providing urine or blood samples as required by the Probation Officer (at his own expense).

B.   He shall pay a **probation supervision fee** of **$5.00** per month beginning with the month of October 2013.

C. He shall pay a **West Virginia Community Corrections Fund Fee** of **$5.00** per month beginning with the month of October 2013.

D.  He shall not associate with any person having a criminal record, or be in the company of any known or suspected drug user, or any person or persons designated by his Probation Officer.

E. He shall comply with any and all recommendations and terms of the treatment plan submitted to the Court in the Sex Offender Presentencing Evaluation by Dr. William Fremouw, Ph.D., dated 08/29/2013, namely:

(1)  Regular outpatient counseling and treatment at a facility such as Valley Mental Health Center or Chestnut Ridge Hospital to monitor his activities and stability at functioning.

(2)  Maintenance on the current psychotropic medications, coordinated by physicians at a facility such as Valley Mental Health Center or Chestnut Ridge Hospital.

(3)  Submission to random drug tests to ensure he is not using any illegal drugs such as marijuana.

(4)  Substance abuse counseling to address alcohol and drug psychological dependence.

(5)  Establishing stable housing for himself based on his own income level and establishment of daily constructive activities such as participation in a sheltered workshop or part-time employment.

(6)  Occasional unannounced visits to his apartment to assess the stability and the safety of that living environment, looking for drugs or alcohol paraphernalia.

6

20.  He shall register with the West Virginia State Police as a sex offender within three (3) business days of being released from incarceration.

21.  Unless otherwise authorized, he shall maintain a single, verifiable residence within Preston County, at which he shall reside.  His Probation Officer must approve any change of address, within the county or otherwise.

22.  He is required to inform all persons with whom he lives about all conditions of his supervision.

23.  He shall maintain employment or perform community service as approved by his Probation Officer.  His Probation Officer must first approve any employment or community service, and locations, and may contact the defendant's employer at any time.  The defendant shall not work in certain occupations that involve being in the private residences of others, such as, but not limited to, door-to-door sales, soliciting, home service visits or delivery.

24.  He shall not establish a residence or accept employment within 1,000 feet of a school or childcare facility, or within 1,000 feet of the residence of a victim or victims of any sexually violent offense for which he has been convicted.

25.  He shall not establish a residence or any other living accommodation in a household in which a child under 16 years of age resides, without petitioning the Court and being granted a modification of this condition; which modification can only be granted if he is the child's parent, grandparent, or stepparent before being convicted, his rights to any children in the home have not been terminated, the child is not a victim of a sexually violent offense committed by the defendant, and the Court determines that he is not likely to cause harm to any child residing in the home.

26.  He shall attend and actively participate in an approved sex offender treatment program as directed by his Probation Officer.  Prompt payment of any treatment program fees is defendant's responsibility and he must maintain steady progress toward all treatment goals as determined by his treatment provider.  Unsuccessful termination of treatment or non-compliance with other required behavioral management requirements will be considered a violation of this condition.  He will not be permitted to change treatment providers without the prior written permission of his Probation Officer or pursuant to a written Order from the Court.

USAO_00270

7

27.  He shall not be present at nor enter for any reason within two blocks of any park, school, playground, swimming pool, daycare center, or other specific locations where children are known to congregate unless approved by his Probation Officer.

28.  He shall not participate in any activity which involves children under 18 years of age, such as but not limited to youth groups, Boy Scouts, Girl Scouts, Cub Scouts, Brownies, 4-H, YMCA, youth sports teams, babysitting, volunteer work, or any activity his Probation Officer deems inappropriate.

29.  He must report any incidental contact with a child or children to his Probation Officer within 24 hours of the contact.

30.  He shall not possess obscene matter as defined by West Virginia Code § 61-8A-1 or child pornography as defined in Title 18 U.S.C § 2256(8), including but not limited to: photographs, videos, magazines, books, DVD's, and material downloaded from the Internet. He shall not visit strip clubs, adult bookstores, motels specifically operated for sexual encounters, peep shows, bars where partially nude or exotic dancers perform or businesses that sell sexual devices or aids.  He shall not possess pictures, films, video, or digital images of children under 12 years of age, unless approved by his Probation Officer.

31.  He shall not miss any appointments for treatment, psychotherapy, counseling, or self-help groups such as any 12-Step Group or Community Support Group, without the prior approval of his Probation Officer.  He shall comply with the attendance policy for appointments as outlined by his Probation Officer.

32.  He shall continue to take any medication prescribed by a physician until otherwise directed.

33.  He shall sign a waiver of confidentiality, release of information, and any other document that permits his Probation Officer and other behavioral management or treatment provider to collaboratively share and discuss behavioral management conditions, treatment progress, and probationary needs, as a team.  This permission may extend to:  (1) sharing relapse prevention plans and treatment progress with significant others and/or any victim's therapist as directed by defendant's Probation Officer or treatment provider(s); and (2) sharing of defendant's modus operandi behaviors with law enforcement personnel.

34.  He shall be subject to a curfew at the direction of his Probation Officer.

USAO_00271

35.  He shall notify his Probation Officer of the establishment of any dating, intimate and/or sexual relationship, no later than 48 hours after the establishment of any such relationship.

36.  He shall not engage in a dating, intimate or sexual relationship with any person who has children under the age of 18 years.

37.  He shall submit to polygraph testing in accordance with West Virginia Code § 62-1D-2 to assist his Probation Officer in monitoring compliance with conditions of probation, which shall be at defendant's own expense, unless judicially determined to be unable to pay for such tests.

38.  In the discretion of his Probation Officer, he shall be subject to electronic monitoring, and such monitoring methods and levels, if any, shall be determined by his Probation Officer.  Following an assessment to determine the level and type of electronic monitoring, if any, necessary for public protection, to be completed within 30 days of the beginning of the probationary period, the Probation Officer may modify the defendant's system and protocol to provide a greater or lesser degree of monitoring.  Any electronic monitoring shall be at the defendant's own expense, unless it is judicially determined that the defendant is unable to pay for such monitoring.

39.  He shall abide by the following computer use conditions:

A.  He is responsible for all data, material, images and information used or accessed through any computer or any removable media within his residence.

B.  He is responsible, as directed, to provide any information regarding any computer system or any removable media within his residence.

C.  He will, as directed by his Probation Officer, permit monitoring or seizure of any personal or professional computers, related components, peripherals, data storage devices, removable media or any object that may appear to be related to the function of a computer.

D.  He will provide any required passwords for any computers accessed by him, as directed by his Probation Officer.

E.  He is prohibited from altering or destroying records of computer use, including the use of software or functions designated to alter or clean computer media, block monitoring software, or restore a computer to a previous state.

F.  He will install or allow to be installed at the direction of his Probation Officer, and at his own expense, monitoring software to monitor or limit computer use.  He will

USAO_00272

remove any hardware and/or software as directed by his Probation Officer at his own expense. He has no expectation of privacy regarding his computer use or information stored on the computer if monitoring software is installed, and he understands and agrees that information gathered by said monitoring software may be used against him in subsequent court actions regarding his computer use and conditions of probation.

G. He will provide any phone records, credit card bills/statements, invoices, transaction records and any other documentation as directed by his Probation Officer.

H. He will obtain prior written permission for his Probation Officer to access any Internet Service Provider relay service that provides access to any external lines of communication. This includes, but is not limited to, electronic bulletin boards, electronic mail systems, chat rooms or ListServs.

I. He is prohibited from using any form of encryption, cryptography, stenography, compression and/or other method that would act to limit access to or change the appearance of any image or data.

J. He will provide his Probation Officer with a current list of all computer equipment used by him, including back-up systems. He will keep the list current.

K. He will not access any computer, including those not at his residence, without prior written permission for his Probation Officer.

L. He specifically agrees and voluntarily consents that his computer may be examined and/or searched at any time, announced or unannounced, by his Probation Officer or the officer's designee to verify compliance with these special conditions.

M. The defendant is advised that computer use and access to the Internet is a privilege, and that privilege may be revoked at any time. He is further advised that any deviation from the above conditions must be approved, in advance and in writing, by his Probation Officer.

40. He shall have no contact, direct or indirect, with the victim.

The Court informed the defendant that if he violates any of the terms and conditions of this Order, a probation or supervising officer may arrest him, and he may be taken into custody by a probation or supervising officer or any law enforcement officer and committed to the Tygart Valley Regional Jail pending further proceedings. If the defendant is taken into custody, a prompt and summary hearing will be held to determine whether the defendant's probation should be revoked. If the Court finds that any condition of probation has been

USAO_00273

10

violated while the probationary terms was in effect, the Court may revoke suspension of the execution of the original sentence and order that the defendant be imprisoned, without credit for the time released on probation.

**In accordance with the provisions of the plea agreement, it is ORDERED that the defendant shall <u>not</u> be subject to extended supervision pursuant to the provisions of West Virginia Code § 62-12-26.**

Payment of Court costs and fees shall be paid by the defendant through the Office of the Clerk of the Circuit Court of Preston County, West Virginia.

The Court explained to the defendant his right to appeal, the necessity of filing a Notice of Intent to Appeal within thirty (30) days, his right to a free transcript, his right to have the Court appoint him an attorney if he cannot afford one, and his right to file a motion for Reduction of Sentence within 120 days as provided in Rule 35(b) of the West Virginia Rules of Criminal Procedure. The defendant was given a written Notice of Appellate Rights, which explains his appellate rights in more detail. The original of the Notice of Appellate Rights was filed in the official case folder. Cheryl L. Warman is continued as counsel for the defendant for the purposes of any appeal and motion for reconsideration of sentence.

The Clerk of this Court is directed to furnish a certified copy of this Order to: Cheryl L. Warman, counsel for the defendant; the defendant, Danny Douglas Hudson, ███████ ████████████████ Tunnelton, WV 26444; the Office of the Prosecuting Attorney; the Probation Office of this Court; and North Central Regional Jail (by fax).

*4 COPIES SID*
*1 COPY FAXED*
*10/3/13*

ENTER: *Oct 3, 2013*

_____
JUDGE

ENTERED: *October 3, 2013*

*Betsy Castle*
CLERK

*by: Ofelia Turner, deputy*

A TRUE COPY:
ATTEST:        S/LISA LEISHMAN
        CLERK OF THE CIRCUIT COURT
By _____ Deputy

USAO_00274

EXHIBIT "B"

# FEDERAL PUBLIC DEFENDER
CENTRAL DISTRICT OF CALIFORNIA
321 EAST 2nd STREET
LOS ANGELES, CALIFORNIA 90012-4202
213-894-2854
213-894-0081

**CUAUHTEMOC ORTEGA**
*Federal Public Defender*
**AMY M. KARLIN**
*Chief Deputy*

**ANGELA VIRAMONTES**
*Riverside Branch Chief*
**KELLEY MUNOZ**
*Santa Ana Branch Chief*
**K. ELIZABETH DAHLSTROM**
*Chief, Capital Habeas Unit*

Direct Dial: (213) 894-7548

July 17, 2023

To: Jaya Gupta, DFPD
From: Inna Verdiyan, LCSW

Re: **Release Planning, Danny Douglas Hudson, Case No. 22-cr-565-DOC**

___

    In my capacity as a social worker at the Federal Public Defender's Office, you have asked me to identify resources for Danny Douglas Hudson in Los Angeles County. The goal of the release plan is to outline the resources and structures that are available to Mr. Hudson upon his release from custody.

    I have developed the following plan based on my formal social work training as well as years of experience providing social services to adults with co-occurring disorders. I am a registered Licensed Clinical Social Worker (LCSW 29765) with the California Board of Behavioral Sciences. In my current professional capacity, I am a Clinical Supervisor of the Social Support Unit.

## <u>Housing</u>

Securing a place to stay is a key part of successful reentry for formerly incarcerated people. Having a stable home is a fundamental part of reentering society, providing a place from which to orient oneself while beginning to search for employment, reestablish social networks, and get treatment. Furthermore, stable housing facilitates feelings of stability and independence, it provides a strong basis of support for any individual reentering the community following an incarceration. This social worker identified a sober living facility which rents rooms to couples, something that is very important to Mr. Hudson.

**Little House on the Block**
Victor Carrillo
Email: vdcarrillo1982@gmail.com

July 17, 2023
Page 2

Contact Phone Number: 310-918-5175
1641 E 109TH ST
LOS ANGELES, CA 90059

If Little House on the Block does not work out for Mr. Hudson this social worker will refer him
to Homeless Health Care Los Angeles (HHCLA) which is a non-profit, community-based
organization that provides supportive services to people who are experiencing homelessness.
With a continuum of services that includes counseling, substance use treatment, syringe
exchange, overdose prevention, and housing with supportive services. Per my conversation with
Joanna Gomez a Client Engagement and Navigation Specialist (CENS) at HHCLA there are
housing and substance use treatment options for Mr. Hudson. He will need to contact HHCLA
upon release for an assessment and screening. This social worker will facilitate the call between
Mr. Hudson and HHCLA.


**Benefits**

General Relief is a county funded program that provides cash aid to adults without any income or
resources. This social worker will assist Mr. Hudson with filling out a Medi-Cal application
through the **benefitscal.com** portal. Mr. Hudson can also apply by telephone or apply in person
at the office location listed below.

Customer Service Center: (866) 613-3777
Address: 11110 W. Pico Blvd. Los Angeles, CA 90064

CalFresh is a county program that issues monthly electronic benefits to low income individuals
that can be used to buy most foods. This social worker will assist Mr. Hudson with applying for
this benefit through the **benefitscal.com** portal.  Mr. Hudson can also apply by telephone or
apply in person at the office location listed below.

Customer Service Center: (866) 613-3777
Address: 11110 W. Pico Blvd. Los Angeles, CA 90064

**Mental Health**

Mr. Hudson would benefit from obtaining mental health counseling approved by the California
Sex Offender Management Board (CASOMB). CASOMB oversees sex offender treatment
providers who provide services to offenders on supervision, also known as Sex Offender
Treatment Program (SOTP).

Additionally, Coalition of Mental Health Professionals is a family wellness center that provides
treatment to people in South Los Angeles:

9219 S. Broadway, Los Angeles, CA 90003
(323) 777-3120

July 17, 2023
Page 3

## Substance Abuse

Sharper Future-is a professional psychological corporation that provides world-calls mental health, substance abuse and forensic rehabilitation and recovery services. Working closely with local, state and federal law enforcement agencies, we are dedicated to improving public safety by leading clients to recovery and a more productive life. The offer cutting edge substance abuse treatment which includes individual and group treatment, family and significant other co-sessions, urine analysis testing and linkage to programs offering detoxification services and medication-assisted treatment.

Los Angeles City (323) 232-2874

## Employment

Chrysalis: a nonprofit organization dedicated to providing a pathway to self-sufficiency to people that are homeless, low income or system impacted by helping them find and keep employment. Chrysalis conducts an initial intake with all of its participants and, based on that intake, they develop a service plan for each of their program members. Service plans include attending classes, resume preparation, practice interviews, online job application assistance, employment counseling and transitional job opportunities. In addition to job preparation services, they offer case management and transportation support.

Chrysalis- Los Angeles
Referral line: (213) 394-2390
Referral email: CS@changelives.org

## Resources

Since 1981, 211 LA County has been a leader in the Information and Referral industry by providing access to comprehensive social services and disaster support for Los Angeles County residents, 24 hours a day, 7 days per week to over 28, 000 health and human service programs.

In addition to all of the resources listed above, I will also be available to Mr. Hudson to ensure a smooth transition to the community.


Sincerely,

/s/

Inna Verdiyan, LCSW
Clinical Supervisor, Social Support Unit